Wilfred KEYES, individually and on behalf of Christi Keyes, a minor, et al., Plaintiffs,

v.

SCHOOL DISTRICT NUMBER ONE, DENVER, COLORADO, the Board of Education, School District Number One, Denver, Colorado, William C. Berge, individually and as President, Board of Education, School District Number One, Denver, Colorado, Stephen J. Knight, Jr., individually and as Vice President, Board of Education, School District Number One, Denver, Colorado, James C. Perrill, Frank K. Southworth, John H. Amesse, James D. Voorhees, Jr., and Rachel B. Noel, individually and as members, Board of Education, School District Number One, Denver, Colorado; Robert D. Gilberts, individually and as Superintendent of Schools, School District Number One, Denver, Colorado, Defendants,

Mr. and Mrs. Douglas Barnett, individually and on behalf of Jade Barnett, a minor, et al., Intervening Defendants.

Civ. A. No. C–1499.

United States District Court,
D. Colorado.
March 21, 1970.

See also D.C., 313 F.Supp. 90.

Barnes & Jensen, by Craig S. Barnes, Holland & Hart, by Gordon G. Greiner, Denver, Colo., Conrad K. Harper, New York City, for plaintiffs.

Wood, Ris & Hames, by William K. Ris, Henry, Cockrell, Quinn & Creighton, by Thomas E. Creighton, Benjamin L. Craig, Michael Jackson, Denver, Colo., for defendants, except John H. Amesse, James D. Voorhees, Jr., and Rachel B. Noel, as individuals.

Charles F. Brega, Robert E. Temmer, Denver, Colo., for intervening defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is an action in which plaintiffs, parents of children attending Denver Public Schools, sue individually and on behalf of their minor children. It is also brought on behalf of a class and has proceeded as a Rule 23 class action.

The complaint contains numerous causes of action and counts, but essentially it is complained that

(1) The Board of Education for School District No. One, Denver, unconstitutionally rescinded certain resolutions which were designed to desegregate specific schools within the District;

(2) The named defendants have created and/or maintained segregated student bodies and faculties in many of the schools in School District No. One;

(3) The said School District has provided an unequal educational opportunity to students attending segregated schools within the District.

Plaintiffs pray for a declaratory judgment that the above acts are unconstitutional and also seek broad injunctive relief prohibiting the defendants from continuing their prior policies and requiring them to remove the effects of their unconstitutional acts.

In July 1969, an extensive trial was had on plaintiffs' motion for a preliminary injunction as to their first claim for relief, which claim alleged that the rescission of the remedial School Board Resolutions 1520, 1524 and 1531 was an unconstitutional act. This Court held that this attempted rescission was in fact unconstitutional, and ordered that specified portions of Resolutions 1520, 1524 and 1531 be effectuated pending full trial on the merits. Keyes v. School District No. 1, Denver, Colorado, 303 F.Supp. 279 (D.Colo.), Supplemental Findings and Conclusions, 303 F.Supp. 289 (D.Colo. 1969).

In February 1970, the case was tried on its merits. The plaintiffs, the defendants and the intervening defendants were fully heard. This was a trial which continued for fourteen trial days. It produced over 2,000 pages of testimony and several hundred exhibits. Thus, the case has been fully tried with the exception of submission by the parties of tangible plans. This phase of the case was deferred pending decision on the issues involving alleged discrimination.

Plaintiffs' first claim for relief deals solely with the purpose and effect of the rescission of Resolutions 1520, 1524 and 1531. Plaintiffs' second claim for relief consists of three counts.[1] The first count of the second claim alleges that the Board of Education has purposely created and/or maintained racial segregation in certain schools within the District through boundary changes, school site selection and the maintenance of the

---

1. The plaintiffs' fourth count of the second claim for relief, based upon maintenance of a "track system," has been abandoned.

neighborhood school policy. The second count alleges that the segregated schools within the District are grossly inferior and provide an unequal educational opportunity for minority students; that these schools do not even meet the separate but equal standard of Plessy v. Ferguson and that the Board is obligated to remedy this inequality regardless of its cause.

Finally, plaintiffs contend that several schools were created and/or maintained as segregated schools by actions of the Board, and that regardless of purpose or intent these acts are unconstitutional. We will deal first with the schools which were the subject of the preliminary hearing, considering the explanatory evidence offered at trial. Secondly, we will consider the evidence which has been offered relative to segregation and discriminatory educational opportunity in the core city schools and, finally, we will discuss possible remedies.

## I.

Plaintiffs' first claim for relief alleges that the rescission of School Board Resolutions 1520, 1524 and 1531 was unconstitutional because its purpose and effect was to perpetuate racial segregation in the affected schools. This claim for relief was the subject of the hearing on plaintiffs' motion for preliminary injunction.

Resolutions 1520, 1524 and 1531, promulgated in 1969, were designed to relieve segregation and the tendency toward segregation in schools located in the Park Hill area of Northeast Denver. These schools include Barrett, Stedman, Hallett, Smith, Phillips and Park Hill Elementary Schools; Smiley and Cole Junior High Schools; and East High School.

The evidence presented at the preliminary hearing has been fully incorporated in the present record. We deem it unnecessary to describe it in detail since it is fully set forth in 303 F.Supp. 279, 289.

A recap will, however, serve to bring those proceedings into context.

Prior to 1950, the Negro population of Denver was concentrated in a portion of the city known as "Five Points," which is located west of Park Hill. Beginning in 1950, the Negro population began an eastward migration which, by 1960, had reached Colorado Boulevard, a natural dividing line. Since 1960, this migration has extended east of Colorado Boulevard into Park Hill. It is the acts of the defendants, taken in the face of this population movement, which plaintiffs contend created the *de jure* segregation complained of in the first claim for relief.

Barrett Elementary School was opened in 1960 at East 29th Avenue between Jackson Street and Colorado Boulevard. The site selected for Barrett, along with the size of the school and its established boundary lines insured that it would be a segregated school from the date of its opening.[2] From these and other facts, we concluded at the preliminary hearing, and we now affirm that holding, that the School Board intended to create Barrett as a segregated school and prevent Negro children from attending the predominantly Anglo schools east of Colorado Boulevard.

At trial (on the merits) defendants attempted to justify Barrett on the ground that until 1964 the Board maintained a racially neutral policy. Racial and ethnic data were not maintained by the District, and race was not considered as a factor in any decision. Defendants further stated that (1) the Barrett site had been owned by the District since 1949 and a school was needed in that general vicinity; (2) Colorado Boulevard was established as the eastern boundary of the Barrett attendance zone because it was a six lane highway and would have been a safety hazard were children required to cross it; and (3) Barrett was built relatively small because its main function was to relieve overcrowding in existing schools rather

---

2. When Barrett opened in 1960, its student body was 89.6 percent Negro.

than to accommodate any significant projected increase in area population.

The above factors fail to provide a basis for inferring that a justifiably rational purpose existed for the action taken with respect to Barrett. *First,* the District owned other sites east of Colorado Boulevard.[3] Had a school been built on one of these sites, it would have not only served the Barrett area, it would also have been integrated. *Second,* the fact that in 1960 many elementary school subdistricts included areas on both sides of busy thoroughfares indicates that safety was not a primary factor in setting school boundaries.[4] *Third,* because of Barrett's small size and the location of its subdistrict boundaries, Barrett relieved overcrowding only at the two predominantly Negro elementary schools west of Colorado Boulevard while affording no relief to the overcrowded Anglo Stedman elementary school eight blocks east of the Barrett site. *Finally,* at the time the decision to build Barrett at 29th and Jackson was made public, a large portion of the Negro community opposed the plan on the ground that Barrett would clearly be a segregated school. This opposition was made known to the Board, and, thus, the School Board cannot now claim that it was uninformed as to the racial consequences of its decisions. Indeed, at that time it was the view of the school administration that it was precluded from taking action which would have an integrating effect.

Between 1960 and 1965, several boundary changes were made in the Park Hill area and mobile units were employed in some Park Hill schools to relieve overcrowding.[5] The effect of these various acts on the racial composition of Park Hill schools was identical. Each tended to isolate and concentrate Negro students in those schools which had become segregated in the wake of Negro population influx into Park Hill while maintaining for as long as possible the Anglo status of those Park Hill schools which still remained predominantly white. From this uniform pattern we concluded that the School Board knew the consequences and intended or at least approved of the resultant racial concentrations. We find nothing in the evidence presented at the trial which detracts from this conclusion.

As noted in our former opinion, in 1962 a Special Study Committee on Equality of Educational Opportunity in the Denver Public Schools (Voorhees Committee) was created. Following a thorough study, the Committee recommended that the School Board consider racial, ethnic and socioeconomic factors in establishing boundaries and locating new schools, and that boundaries be set so as to establish heterogeneous school communities. Pursuant to this recommendation, the · Board adopted Policy 5100, which called for changes or adaptations which would result in a more diverse or heterogeneous racial and ethnic school population.

---

3. Dr. Oberholtzer testified that at the time Barrett was built, the School District also owned sites at 35th and Dahlia and 36th and Jasmine (Tr. pg. 2084).

4. For example, in 1960, the attendance areas of the following elementary schools included areas on both sides of the indicated thoroughfares: Teller and Steck (Colorado Blvd.) ; Albion, Park Hill, Teller, Stevens, Wyman, Emerson, Evans, Greenlee, Cheltenham, and Colfax (Colfax Ave.) ; Crofton and Ebert (Broadway) ; Columbian, Cheltenham, Eagleton and Barnum (Federal Blvd.). Furthermore, it was the policy of the Board to place

an elementary school at the center of its attendance area wherever possible. This policy was clearly ignored in the case of Barrett.

5. The 1962 and 1964 boundary changes affected Stedman, Hallett, and Phillips schools. Mobile units were added to Stedman in 1964 and 1965 and to Hallett in 1965. For a more complete discussion as to the consequences of these boundary changes and mobile units see our opinions on plaintiffs' motion for preliminary injunction, reported at 303 F.Supp. 279 and 303 F.Supp. 289.

A second study committee (Berge Committee) was established in 1966 to examine the policies of the Board with respect to the location of new schools in Northeast Denver and to suggest changes which would lead to integration of student population in Denver schools. This committee recommended that no new schools be built in Northeast Denver; that a cultural arts center be established which would be attended by students from various schools on a half-day basis once or twice a week; that educational centers be created; and that a superior school program be initiated for Smiley and Baker junior high schools.

After more than six years of studying and discussing these committee reports and recommendations, the Board in 1968 passed the "Noel Resolution" (Resolution 1490). The "Noel Resolution" noted that Policy 5100 recognized that continuation of neighborhood schools had resulted in the concentration of minority racial and ethnic groups in some schools within the District and that these schools provided an unequal educational opportunity. The Resolution directed the Superintendent of Schools to submit to the Board a comprehensive plan for the integration of the Denver Public Schools.

Pursuant to the "Noel Resolution's" directive, the Superintendent submitted a report entitled "Planning Quality Education—A Proposal for Integrating the Denver Public Schools." Between January and April 1969, the Board studied the Superintendent's report and passed three resolutions—1520, 1524 and 1531. These Resolutions were the product of intense study and discussion and were developed only after considering some fourteen alternative plans. Basically, their purpose was to eliminate segregation in the Negro schools in Park Hill while stabilizing the racial composition of schools in transition. Thus, these Resolutions constituted the first acts of departure from the Board's prior undeviating policy of refusing to take any positive action which would bring about integration of the Park Hill schools.[6]

In May 1969, a School Board election was held. Much of the campaign revolved around Resolutions 1520, 1524 and 1531, especially those portions which called for mandatory bussing to relieve segregation. The two candidates who had pledged to rescind Resolutions 1520, 1524 and 1531 were elected. On June 9, 1969, the three Resolutions were rescinded and in their stead the Board passed Resolution 1533, which sought to achieve desegregation on a voluntary basis.[7] The rescissions were effectuated with little study and were justified only as a response to the community sentiment expressed in the School Board election.

We concluded at the hearing on preliminary injunction that the adoption of Resolutions 1520, 1524 and 1531 was a "bona fide attempt of the Board to recognize the constitutional rights of the persons affected by the prior segregation." 303 F.Supp. at 295. We further concluded, on the other hand, that the act of the Board repudiating these salutary policies was a legislative act and one of *de jure* segregation.

> The rescission of Resolutions 1520, 1524 and 1531 was a legislative act which had for its purpose restoration of the old status quo and was designed to perpetuate segregation in the affected area. This act in and of itself

6. To be sure, the Board had adopted statements of policy, such as Policy 5100, suggesting that it had abandoned its prior philosophy. However, Resolutions 1520, 1524 and 1531 marked the first time the Board had backed up earlier policy statements with affirmative action.

7. Resolution 1533 provided for a voluntary exchange program at Hallett Elementary School on a reciprocal basis, i. e., a volunteering pupil from Hallett could transfer to another school *if* a pupil from that school would volunteer to attend Hallett. The Resolution also called for the transfer of 120 Stedman students, on a voluntary basis, to other elementary schools where space was available.

was an act of de jure segregation. It was unconstitutional and void. 303 F.Supp. at 295.

■ At trial defendants claimed that the three Resolutions had not been implemented at the time of the rescission, and thus in effect that no rights had ever vested under them. Yet the only apparent purpose of the rescission was to maintain a segregated condition at those schools which, but for the rescission, would have been afforded considerable relief. True, the resolutions had not been carried out, but extensive preparations were in progress. In any event, this cannot be made to turn on any property right analogy. Plaintiffs were deprived of a right to seek and possibly to attain equality.

Our preliminary injunction ordered full implementation of Resolutions 1520, 1524 and 1531, except to the extent that the Resolutions apply to East High School and Cole Junior High School. We now hold that the rescission as it applied to East and Cole was also unconstitutional. The School Board recognized that East High School contained growing numbers of minority pupils and that this rapid advance toward segregation threatened the high quality of education which had always been characteristic of East High School. It was, therefore, considered desirable to reduce the number of minority students at East and to stabilize the racial composition therein.[8] Although East may not now be a segregated school, it is unquestionably a school in transition. Left alone it will quickly become segregated. The School Board, with the passage of Resolution 1520, was administering preventive justice. It was making a reasonable and good faith effort to prevent East from becoming a segregated school.

Even though the racial composition at Cole Junior High School was not significantly changed by Resolution 1524,

the Resolution did reduce the pupil membership at that school by 275 students. The purpose of this change was to decrease the pupil-teacher ratio at Cole and to make room for a number of special programs to be instituted there. This was also a good faith effort by the Board to improve the quality of education at the predominantly Negro Cole. The action of the Board in aborting and frustrating this effort cannot stand.

We conclude then that the effect of the rescission of Resolution 1520 at East High was to allow the trend toward segregation at East to continue unabated. The rescission of Resolution 1524 as applied to Cole Junior High was an action taken which had the effect of frustrating an effort at Cole which at least constituted a start toward ultimate improvement in the quality of the educational effort there. It perhaps looked to ultimate desegregation. We must hold then that this frustration of the Board plan which had for its purpose relief of the effects of segregation at Cole was unlawful. Resolutions 1520 and 1524, as they apply to East and Cole, should be implemented.

In reaching the above conclusion, we have very carefully considered both the majority and minority opinions in the now famous Supreme Court decision of Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and have concluded that both opinions fully support the position which we have taken.

It will be recalled that *Mulkey,* like the case at bar, had to do with the repeal of legislative acts which recognized rights guaranteed by the equal protection clause of the Fourteenth Amendment. These were in the form of California statutes prohibiting the denial by individuals of the right to be free and equal regardless of race. The plaintiffs were tenants in apartment buildings, who were denied accommodations. By

---

8. Prior to the passage of Resolution 1520 the racial composition at East was approximately 54 percent Anglo, 40 percent Negro and 7 percent Hispano. The effect of the resolution would be to reduce minority enrollment at East to 32 percent.

initiative a constitutional amendment, Proposition 14, was adopted. This seemingly innocuous provision guaranteed to everyone unlimited right to decline to sell or rent his property in his uncontrolled discretion. Thus, Proposition 14, or Article I, Section 26, effectively repealed the statute relied on by plaintiff.

The Supreme Court struck down the California amendment adopted by popular vote and did so despite its neutral visage. The Court held that it had the effect of involving the state in "private racial discriminations to an unconstitutional degree." The majority opinion of Mr. Justice White, in concluding that this was discriminatory state action, said:

In the present cases squarely controls the case we now have before us. But they do illustrate the range of situations in which discriminatory state action has been identified. They do exemplify the necessity for a court to assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations. Here we are dealing with a provision which does not just repeal an existing law forbidding private racial discriminations. Section 26 was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State. The California Supreme Court believes that the section will significantly encourage and involve the State in private discriminations. We have been presented with no persuasive considerations indicating that these judgments should be overturned. 387 U.S. at 380–381, 87 S.Ct. at 1634.

Our case is like *Mulkey* in that it also involves repeal or rescission of a previous enactment which extended and upheld non-discriminatory rights. Our case is stronger than *Mulkey* in that there the statute was brought to bear on private transactions. Here, on the other hand, there can be no question about whether it is the state which is discriminating.

The sole basis for the dissenting opinion of Justice Harlan was that the constitutional provision was not state action; that it was merely a proclamation of state neutrality in transactions private in nature. The opinion of Mr. Justice Harlan states:

In the case at hand California, acting through the initiative and referendum, has decided to remain 'neutral' in the realm of private discrimination affecting the sale or rental of private residential property; in such transactions private owners are now free to act in a discriminatory manner previously forbidden to them. In short, all that has happened is that California has effected a *pro tanto* repeal of its prior statutes forbidding private discrimination. This runs no more afoul of the Fourteenth Amendment than would have California's failure to pass any such antidiscrimination statutes in the first instance. The fact that such repeal was also accompanied by a constitutional prohibition against future enactment of such laws by the California Legislature cannot well be thought to affect, from a federal constitutional standpoint, the validity of what California has done. The Fourteenth Amendment does not reach such state constitutional action any more than it does a simple legislative repeal of legislation forbidding private discrimination. 387 U.S. at 389, 87 S.Ct. at 1638.

It cannot be argued in the case at bar that the legislative action of the School Board was neutral. The Board specifically repudiated measures which had been adopted for the purpose of providing a measure of equal opportunity to plaintiffs and others. The School Board action was, to say the least, not neutral and the causal relation between the School Board action and the injuries is direct. We find and conclude then that *Mulkey* not only supports our position, it is a compelling authority in support of the conclusion which we have

reached. It is so closely analogous that we would be remiss if we failed to follow it.

## II.

The evidentiary as well as the legal approach to the remaining schools is quite different from that which has been outlined above. For one thing, the concentrations of minorities occurred at an earlier date and, in some instances, prior to the *Brown* decision by the Supreme Court. Community attitudes were different, including the attitudes of the School Board members. Furthermore, the transitions were much more gradual and less perceptible than they were in the Park Hill schools.

Still another distinguishing point is that we do not here have legislative action similar to the rescission of Resolutions 1520, 1524 and 1531.

The first count of plaintiffs' second claim for relief alleges that *de jure* segregation exists at Manual High School; Cole Junior High School; Morey Junior High School; Boulevard Elementary School; Columbine Elementary School and Harrington Elementary School as a result of School Board action designed to isolate Negro and Hispano children in the above schools. Furthermore, plaintiffs claim that this intentional isolation of minority children aggravated or produced the segregated condition of the schools in question.

In support of their allegations, plaintiffs have offered boundary changes and other acts on the part of the School Board as constituting *de jure* segregation.

Before discussing the acts which are relied on, one other factor needs to be mentioned. In some of the schools there are concentrations of Hispanos as well as Negroes. Plaintiffs would place them all in one category and utilize the total number as establishing the segregated character of the school. This is often an oversimplification (certainly if relief is to be granted in a school, the Hispano should receive the same benefit as the Negro.) The plaintiffs have accomplished this by using the name "Anglo" to describe the white community. However, the Hispanos have a wholly different origin, and the problems applicable to them are often different.

One of the things which the Hispano has in common with the Negro is economic and cultural deprivation and discrimination. However, whether it is permissible to add the numbers of the two groups together and lump them into a single minority category for purposes of classification as a segregated school remains a problem and a question.

It would seem then that to the extent that Hispanos, as a group, are isolated in concentrated numbers, a school in which this has occurred is to be regarded as a segregated school, either *de facto* or *de jure*.

We turn now to a consideration of the evidence offered by plaintiffs regarding boundary changes and elimination of optional areas, which evidence is presented in support of their argument that *de jure* segregation exists in the affected schools. Our comments and legal conclusions will follow.

1. *New Manual High School* (Location: 1700 East 28th Avenue. Present Racial Composition: 60.2 percent Negro, 27.5 percent Hispano, 8.2 percent Anglo)

Both the old and the new Manual were and are located in the older part of the city. This is an area which has long been occupied by the Negroes and is now partly occupied by the Hispanos as well. In the very earliest days of Denver it probably had no racial or ethnic character, and before the Negroes it was in all likelihood occupied by laboring people of various national origins.

The Negro movement has always been eastward because this has been the only open corridor, and this continues to be the case. Plaintiffs' big complaint is that the school was built in this old location and was thus earmarked for minority occupants. However, we have to be mindful of the evidence that it was opened in 1953 at a time prior to Brown

v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and we are told that this location had the consent of the people in the neighborhood. At that time there was much less concern about minority concentration. The community concern was with the nature and character of the new facility. In any event, the new Manual High School had the same attendance boundaries as the old. The eastern boundary of the mandatory Manual attendance zone was between Williams and High Streets, just one-half block east of the school site.[9]

In 1953, Manual was operating under its capacity, while East High School, to the southeast, was filled to capacity.[10] Athough data is not available as to the 1953 Hispano enrollment at Manual, we know that in 1949–50 this figure was 23.5 percent. The Negro enrollment at Manual in 1953 was 35 percent. We can infer, therefore, that when new Manual opened in 1953, it was a minority school if Negroes and Hispanos are aggregated. Nearby East High School was predominantly Anglo, with a Negro enrollment of only two percent.

By 1956, Manual High School was 42 percent Negro. Whereas in 1953 the Williams-High boundary of the Manual attendance zone was approximately coterminus with the easternmost point of Negro population movement, by 1956 the Negro population had expanded eastward to roughly York Street. In January 1956, the school administration recommended that the Manual boundary be moved east to York Street, thus including a portion of the former East-Manual optional zone.[11] This proposed boundary, therefore, coincided with the eastern movement of Negro population in that area.

The 1956 Manual boundary change was resisted by some members of the Negro community on the ground that it would serve to contain Negro students living between Williams and York at Manual by cutting off their prior option to attend East. This concern was communicated to the School Board at a series of public meetings. The school administration justified the change on the basis of the overcrowding at East and the underutilization at Manual. Manual had sufficient capacity to accommodate more students than those to be transferred under the proposed boundary change. It was, therefore, suggested that the Board move the Manual boundary east to Colorado Boulevard. This would have embraced a predominantly Anglo neighborhood. Such a move would not only have further alleviated overcrowding at East, but would also have had some integrating effect at Manual. How much we do not know. It would not have substantially changed its character, and the integrating effect would have been temporary, only because in a few years this neighborhood became Negro.

2. *Cole Junior High School* (Location: 3240 Humboldt Street. Present Racial Composition: 72.1 percent Negro; 25.0 percent Hispano; 1.4 percent Anglo)

---

9. The new Manual attendance area was irregularly shaped with its northern boundary at the city limits, its western boundary at the Platte River, and its southern boundary at 17th Avenue. Only the eastern boundary, between Williams and High Streets, is relevant for the purposes of this case.

10. The capacity utilization of a school is a function of school size and number of students. Plaintiffs have computed school capacity by using the figure of 30 students per room multiplied by the number of rooms in the school. Defendants contend that this is unrealistic, because at lower achieving schools the student-teacher ratio has been reduced, so that, for example, 25 students per room may constitute capacity. Throughout this opinion, the lower achieving schools will be considered undercapacity only where the degree of undercapacity as represented by plaintiffs' data is so great that it cannot be explained purely in terms of a lower teacher-pupil ratio.

11. East High School, at this time, had a Negro enrollment of one percent.

In 1952, the eastern boundary of Cole Junior High was four blocks east of the school, between High and Race Streets.[12] At this time Cole was undercapacity while Smiley Junior High, a predominantly Anglo school a short distance east of Cole, was overcapacity by approximately 300 students. Although the empty space at Cole would have been utilized to alleviate overcrowding at Smiley, this course of action was not taken.[13] Instead, the school administration determined to construct an addition at Smiley.

In 1956, a boundary change was proposed whereby the eastern boundary of Cole would be extended to York Street, thus transferring part of the Cole-Smiley optional zone to Cole.[14] This proposed change was criticized by members of the Negro community on the ground that its tendency was to preclude Negro students who were living between Race and York Streets from attending Smiley and would force them to attend Cole, which, by this time, was rapidly becoming a segregated school. Nevertheless, the Cole-Smiley boundary proposal was adopted. After the shift in the Cole boundary, Smiley remained overcapacity while Cole was substantially undercapacity.

In 1958, another addition was built at Smiley. As in 1952, this action was taken notwithstanding that empty spaces were available at Cole.

In March 1969, the School Board adopted Resolution 1524, which called for the reduction of student population at Cole. This action was designed to improve the educational opportunity offered to those students remaining at Cole, while making room for special education programs for low achieving students. Resolution 1524 was rescinded in June 1969.[15]

3. *Morey Junior High School* (Location: 840 East 14th Avenue. Present Racial Composition: 52.4 percent Negro; 26.8 percent Anglo; 18.6 percent Hispano)

The racial composition of Morey Junior High School in 1961 was between 65 and 80 percent Anglo. Morey was surrounded on four sides by optional zones. In 1962, the School Board adopted boundary changes which eliminated all but one of the Morey optional zones.[16] After this enactment became effective, the estimated Anglo enrollment at Morey declined to between 45 and 49 percent. Thus, the 1962 Morey boundary changes

12. Although there is no direct evidence of the racial composition of Cole in 1952, we may infer that it was a predominantly minority school at that time from the fact that in 1946–47 its racial composition was 43 percent Anglo; 21 percent Negro; 29 percent Hispano and 7 percent "Mongolian." By 1952 the Negro enrollment at Cole had increased to 30 percent.

13. This would presumably have entailed the transfer of Anglo students at Smiley to the predominantly minority Cole.

14. This 1956 boundary change was allegedly made in response to the building of Hill Junior High School. However, the Hill attendance zone was carved out of the Smiley, Morey and Gove attendance zones and Cole did not play a significant part in the creation of the Hill area. It is also apparent that the Cole-Smiley boundary change of 1956 paralleled the Manual-East change of that same year, and the objections of many Negro leaders were the same with respect to both of these changes.

15. We have determined in part I of this opinion that the rescission of Resolution 1524 was unconstitutional and that Resolution 1524 should be effectuated with respect to Cole. In this part of the opinion we are concerned only with whether further relief is warranted with reference to Cole.

16. The 1962 changes involved transferring the Morey-Hill optional zone to Hill; the Morey-Byers optional zone to Byers; the Morey-Cole optional zone to Morey; and the Baker-Morey optional zone to Morey. The racial composition of each of these areas, as reflected by 1960 census tract data, is roughly as follows:

 A. Morey-Hill optional zone—0 to 3 percent Negro, 0 to 3 percent Hispano

 B. Morey-Byers optional zone—0 to 3 percent Negro, 0 to 3 percent Hispano

 C. Morey-Cole optional zone—10 percent to over 50.1 percent Negro (with the larger portion over 50.1 percent Negro), 3.1 to 10 percent Hispano

were largely responsible for the transformation of Morey from a predominantly Anglo school in 1961 to a predominantly minority school in 1962.

The defendants' testimony was to the effect that these changes were made in order to better utilize the capacities of Hill, Byers and Baker junior high schools. The testimony also showed that at that time Cole Junior High School, which was then predominantly Negro, was overcapacity and Morey was the most convenient school available for the purpose of accomplishing the objective. The effect, of course, was to relieve somewhat the concentration of Negroes at Cole, while substantially increasing the number of Negroes at Morey.

Undoubtedly, it is possible that the Board could have worked out a more equitable distribution, but it cannot be said that this was carried out with the design and for the purpose of causing Morey to become a minority school. The Board could not have escaped criticism from the plaintiffs if it had continued the concentration of Negroes at Cole rather than transferring them to Morey.

4. *Boulevard Elementary School* (Location: 2351 Federal Boulevard. Present Racial Composition: 68.1 percent Hispano, 29.9 percent Anglo)

In 1961, Boulevard Elementary School was undercapacity and its racial composition was 59 percent Anglo and 40 percent Hispano. Brown Elementary School, five blocks west of Boulevard, was operating at approximately full capacity and was 98 percent Anglo. Ashland Elementary School, northeast of Boulevard, was operating at its capacity and was 61 percent Anglo and 37 percent Hispano. The razing of a portion of Boulevard resulted in a decrease in that school's capacity, requiring the adminis-

tration to adjust the Boulevard boundaries. The western portion of the Boulevard subdistrict was transferred to Brown and the southwest part of the Ashland attendance zone was assigned to Boulevard. As a result of these boundary alterations, the Hispano population of Boulevard was increased to 60 percent while reducing the Anglo enrollment to 39 percent, thus transforming Boulevard from a predominantly Anglo to a predominantly Hispano school. The school administration denied that this decision had any racial or ethnic character, maintaining that it was a matter of necessity because of the age and condition of the building destroyed.

5. *Columbine Elementary School* (Location: 2545 East 28th Avenue. Present Racial Composition: 97.2 percent Negro; 2.2 percent Hispano; .6 percent Anglo)

In 1951, Columbine Elementary School was overcapacity and its Negro enrollment was 24 percent. Harrington Elementary was slightly overcapacity and had no Negro students. Stedman Elementary School, which has been considered in part I of this opinion, at 29th and Dexter, was operating slightly under its capacity and also had no Negro students.

Three optional zones were established around Columbine in 1952–Columbine-Harrington; Columbine-Mitchell; and Columbine-Stedman. The asserted purpose of this action was to relieve overcrowding at Columbine. However, since both Harrington and Stedman were operating at approximately their capacity prior to the creation of the optional zones, the effect of the administration's action was to slightly decrease overcrowding at Columbine while creating an overcrowded situation at Harrington and Stedman. Furthermore, a study of the racial composition of these schools one

D. Baker-Morey optional zone—0 to 3 percent Negro, 10.1 to 25 percent Hispano

Also, a portion of the Cole Junior High mandatory zone was transferred to Morey, the racial composition of this area being over 50.1 percent Negro and 3.1 to 10 percent Hispano.

A particularly strong protest with respect to the above boundary changes was voiced by parents of Anglo children living between 6th and 8th Avenues in a mandatory Morey attendance zone. They asserted that these changes would transform Morey into a minority school. In response to this protest the School Board also transferred this area between 6th and 8th Avenues to Byers, a predominantly Anglo junior high school.

year after the creation of the optional zones indicated that the options were apparently employed by Anglo students as a means of escaping from Columbine to the almost totally Anglo Harrington and Stedman.[17]

Before considering the legal consequences of the above discussed actions of the School Board, there are some other facts which should be mentioned.

Former Superintendent Oberholtzer testified at great length to the fact that the administration, including the Board, followed a policy of strict neutrality as far as segregation or integration was concerned. Indeed, Superintendent Oberholtzer stated that even after the decision in Brown v. Board of Education, *supra*, he was of the opinion that it was not permissible for him to classify Negroes as such, even for the purpose of bringing about integration. Thus, it was his belief that he was committed to maintaining the status quo in the schools. Other members of the Board also denied vigorously that they had ever been motivated by either an intention or desire to discriminate. Their testimony was that the boundary changes and their other actions were taken in order to utilize school capacities and carry out the neighborhood school concept.

In examining the boundary changes and removal of optional zones in connection with the several schools which are discussed above, we do not find any wilful or malicious actions on the part of the Board or the administration (in relationship to elementary schools). As to these schools, the result is about the same as it would have been had the administration pursued discriminatory policies, since the Negroes and, to an extent the Hispanos as well, always seem to end up in isolation. The substantial factor in this condition is twofold: First, a failure on the part of the Board or of the administration to take any action having an integrating effect, and secondly, deeply established housing patterns which have existed for a long period of time and which have been taken for granted.

It should also be kept in mind that prior to Brown v. Board of Education, *supra*, it was apparently taken for granted by everybody that the status quo, as far as the Negroes were concerned, should not be disturbed because this was the desire of the majority of the community. Time and again the Board members testified to the fact that in making decisions they held hearings and finally bowed to the community sentiment. Thus, they say they did not intend to segregate or refuse to integrate. They just found the consensus and followed it.

■■ Under the present state of the law, particularly in the Tenth Circuit, a condition such as we have described above does not dictate the conclusion that this is *de jure* segregation which calls for an all-out effort to desegregate. It is more like *de facto* segregation, with respect to which the rule is that the court cannot order desegregation in order to provide a better balance.

It is to be emphasized here that the Board has not refused to admit any student at any time because of racial or ethnic origin. It simply requires everyone to go to his neighborhood school unless it is necessary to bus him to relieve overcrowding.

■ From the cases, we gleaned the following principles as essentials of *de jure* segregation:

(1) The State, or more specifically, the school administration, must have taken some action with a purpose to segregate;

(2) this action must have in fact created or aggravated segregation at the school or schools in question;

(3) a current condition of segregation must exist; and

(4) there must be a causal connection between the acts of the school administration complained of and the current condition of segregation.

17. Between 1951 and 1952, the Negro enrollment at Columbine jumped from 24 percent to 31 percent, while there was no significant increase in Negro enrollment at either Harrington or Stedman. Between 1952 and 1955, the Negro enrollment at Columbine increased 38 percent.

The first of the above requirements actually consists of two elements—state action and a purpose to segregate. It seems unnecessary to elaborate on the element of state action at this time, since plaintiffs here emphasize only affirmative official acts.

■ The important distinguishing factor between *de facto* and *de jure* segregation is purpose to segregate. *See, e. g.,* Board of Education, etc. v. Dowell, 375 F.2d 158 (10th Cir. 1967), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L. Ed.2d 993 (1967); Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965). As the Court of Appeals for the Tenth Circuit stated in *Dowell, supra*:

> In Downs the trial court found the plan was not being used to deprive students of their Constitutional rights and here the trial court, in substance, found to the contrary. It is still the rule in this Circuit and elsewhere that neighborhood school attendance policies, when impartially maintained and administered, do not violate any fundamental Constitutional principle or deprive certain classes of individuals of their Constitutional rights. 375 F.2d at 166.

■ Segregative purpose may be overt, as in the dual system maintained in some states prior to Brown v. Board of Education, *supra*, or it may be covert, in which case purpose normally must be proved by circumstantial evidence. In order to satisfy this element of purpose, the intent to segregate need not be the sole motive for a school district's action; it need only be one of several factors which motivated the school administration. Thus, regardless of how this purpose is manifested, it is clear that:

> the constitutional rights of children not to be discriminated against in school admission on grounds of race or color * * * can neither be nullified openly and directly by state legis-

lators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "geniously or ingenuously" Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 19 (1958).

■ The second requirement, assuming purposeful state action, is that the act or acts must have resulted in or substantially aggravated segregation. A threshold problem here is a definition of "segregation." This term connotes first and foremost a very heavy concentration of a minority group within the school in question. Once you have a predominantly minority school population, other factors come into consideration. For example, the racial and ethnic composition of faculty and staff, *e. g.,* Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Hobson v. Hansen, 269 F.Supp. 401, 502 (D.D.C.1967), aff'd. *sub nom.,* Smuck v. Hobson, 132 U.S.App. D.C. 372, 408 F.2d 175 (1969); the equality of educational opportunity offered at the school; and the community and administration attitudes toward the school.

■ The third requirement, that a condition of segregation presently exists, recognizes the fact that the term *"de jure* segregation" speaks in present terms. In other words, if a past condition of segregation has been remedied, either through positive state action or through the natural course of events, there is, of course, no present injury justifying equitable relief.

■ The final and most important element in this case is that of a causal relationship between the discriminatory action complained of and the current condition of segregation in the school or schools involved. Thus, it would be inequitable to conclude *de jure* segregation exists where a *de jure* act had no more than a trifling effect on the end result which produced the condition.[18] In such a case no relief can be

18. Although past discriminatory acts may not be a substantial factor contributing to present segregation, they may neverthe-

less be probative on the issue of the segregative purpose of other discriminatory acts which are in fact a substantial factor

granted, for it is not the duty of a court of equity to punish a school board for all past sins, but rather to afford a remedy only where past sins have resulted in present injury.

This necessity of a causal connection between present injury and past discriminatory acts was recognized in Hobson v. Hansen, *supra*. Prior to 1954 the District of Columbia schools had been segregated by law. In 1954 a neighborhood policy was adopted in the District. At the time the *Hobson* case was instituted, substantial desegregation had not been achieved. Plaintiffs, therefore, contended that the effects of the dual system still remained and that they were entitled to relief. Judge Wright held that the dual system was insignificant as a cause of the present segregation:

> This suit was begun 12 years after the institution of the neighborhood school policy, * * *. Many concurrent causes have combined with the Board's 1954 decisions in the evolution of present reality. If the segregation in the District's schools is not currently objectionable under either an independent *de facto* or *de jure* rationale, it would be very difficult to strike it down merely because the neighborhood school policy failed to produce sufficient integration when it replaced an overt *de jure* system 13 years ago. 269 F.Supp. at 495.

So also in our case, the complained of acts are remote in time and do not loom large when assessing fault or cause. The impact of the housing patterns and neighborhood population movement stand out as the actual culprits.

Plaintiffs have argued that the construction of the new Manual in 1953 at the old site virtually insured its segregated character and that this act, as well as the Manual and Cole boundary changes, together with the Smiley additions at a time when Cole was undercapacity, are acts of *de jure* segregation. Quite apart from the cause element which will be dis-

cussed further below, it cannot be said that the acts were clearly racially motivated. One would have to labor hard in order to come up with this conclusion.

It can, however, be concluded that the segregation (or racial concentration) which presently exists at Manual and Cole, except insofar as Cole was affected by Resolution 1524 and its rescission as explained above in part I, is not *de jure*. How much of an impact the Board's decisions at the time had on minority concentrations we do not know. We do know that much of the concentration occurred long after these decisions were made. For example, the Negro population at Cole and Manual increased over 20 percent between 1963 and 1968, and the only contribution which the Board could have made to that resulted from inaction. An essential requisite of a violation of the equal protection clause of the Constitution in the present context is positive legislative or administrative state action which discriminates on account of race, and which produces the condition complained of. The instant situation then cannot be placed at the administration doorstep; if cause or fault has to be ascertained it is that of the community as a whole in imposing, in various ways, housing restraints.

Similarly, it is doubtful whether the 1952 boundary change at Columbine can now be classified as a *de jure* act. To be sure, it increased the minority concentration at Columbine; yet there is a dearth of evidence that this was accompanied by a purpose to segregate rather than a purpose to eliminate double sessions, which was also a result of the change. In any event, as in the case of Manual and Cole, this act appears in retrospect to have had little to do with the present minority population at Columbine. Between 1953, the year following the Columbine boundary modification, and 1969, the percentage of Negro enrollment at the school more than doubled. Even the 1960 census tract data shows that almost the entire Columbine

---

in causing a present segregated situation. Thus, in part I of this opinion, we discussed the building of Barrett, boundary

changes and the use of mobile units as they relate to the purpose for the rescission of Resolutions 1520, 1524 and 1531.

subdistrict was in an area with over 50.1 percent Negro population. It is not conceivable then that this 1952 boundary change, the immediate effects of which were relatively insignificant, could be a current cause of segregation at Columbine.

The Boulevard boundary change of 1962 was necessitated by the legitimate need to reduce pupil enrollment due to the razing of a portion of the school. Furthermore, there is absolutely no evidence presented, other than the fact of the 1962 change, upon which to base a finding that the School District was motivated by an intent to segregrate Hispano students at Boulevard Elementary School.

The removal of the Morey Junior High School optional zones in 1962 did have the effect of increasing the concentration of minority students at that school. It also had the salutary effect of relieving the concentration of Negro students at Cole, a result consistent with defendants' claim that it was carrying out a racially neutral policy. Both the desirable and undesirable consequences of the 1962 changes appear to have been by-products of a general redistribution. In view of that, it would strain both the facts and law to say that the administration acted with an unlawful purpose or design in this instance.

Moreover, whether Morey is presently a segregated school remains a question. To so categorize it requires the lumping together of all non-Anglo groups. The current racial composition at Morey is 52.4 percent Negro, 26.8 percent Anglo, 18.6 percent Hispano. Over 80 percent of the classroom teachers at Morey are Anglo. Morey is unquestionably racially imbalanced, is in transition and will offer a concentration problem unless the Board acts to stabilize it.

■ Plaintiffs' further claim is that the neighborhood school policy itself has been maintained by the School Board for the purpose and with the effect of segregating minority pupils to the degree that it is unconstitutional. They rely on the rulings of our Court of Appeals that the deliberate use of a neighborhood school system to perpetuate segregation is unlawful. Board of Education, etc. v. Dowell, 375 F.2d 158 (10th Cir. 1967), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); Downs v. Board of Education, 336 F.2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965). What we have said above regarding boundary changes disposes of this contention. There is no comprehensive policy apparent other than the negative approach which has been described which could be considered in this context. The Board's eye-closing and head-burying is not the kind of conduct which the Circuit Court had in mind in *Dowell* and *Downs*.

■ Finally, the third count of plaintiffs' second claim for relief urges us to adopt a rule of law that a neighborhood school policy may in and of itself create and/or maintain unconstitutional segregation, even if the adoption of such a policy is motivated by legitimate factors. Plaintiffs' argument in essence is that the neighborhood school system is unconstitutional if it produces segregation in fact. We recognize that some courts have moved along this line.[19] However, the law in our Circuit, as enunciated in *Downs* and *Dowell, supra,* is that a neighborhood school policy, even if it produces concentration, is not *per se* unlawful if:

it is carried out in good faith and is not used as a mask to further and perpetuate racial discrimination. Board of Education, etc. v. Dowell, 375 F.2d 158, 166 (10th Cir. 1967).

The United States Supreme Court has not yet ruled on this question, and we are here subject to the strong pronouncements of our Circuit Court. Under these

---

19. Hobson v. Hansen, 269 F.Supp. 401 (D. D.C.1967), *sub nom.,* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); Barksdale v. Springfield School Committee, 237 F.Supp. 543 (D.Mass. 1965), vacated, 348 F.2d 261 (1st Cir. 1965); Blocker v. Board of Education, 226 F.Supp. 208 (E.D.N.Y.1964); Branche v. Board of Education, 204 F. Supp. 150 (E.D.N.Y.1962).

decisions plaintiffs are not entitled to relief merely upon proof that *de facto* segregation exists at certain schools within the School District.[20]

In summary then, we must reject the plaintiffs' contentions that they are entitled to affirmative relief because of the above mentioned boundary changes and elimination of optional zones. We hold that the evidence is insufficient to establish *de jure* segregation.

### III.

The third count of plaintiffs' second claim for relief alleges that defendants are maintaining certain schools within the District which provide an unequal educational opportunity for the students attending them; that these are segregated schools;[21] and that, therefore, the students at these schools are being denied the equal protection of the law. The plaintiffs seek relief for a large number of schools at every level and in various conditions of racial concentration. These include Barrett, Boulevard, Bryant-Webster, Columbine, Crofton, Ebert, Elmwood, Fairmont, Fairview, Garden Place, Gilpin, Greenlee, Hallett, Harrington, Mitchell, Smith, Stedman, Whittier, Wyatt and Wyman Elementary Schools; Baker, Cole, Morey and Smiley Junior High Schools; and East, Manual and West High Schools.[22] In addition to the charge that all these schools are segregated,[23] plaintiffs maintain these are inferior schools and that racial concentra-

tion produces the inferiority. They use several indicia to establish the inferiority and inequality. All of these schools, they say, have (1) low average scholastic achievement; (2) less experienced teachers; (3) higher rates of teacher turnover; (4) higher dropout rates; and (5) older buildings and smaller sites.

Extensive and detailed evidence has been presented establishing the inferiority of plaintiffs' target schools. Some of these have high concentrations of either Negroes or Hispanos. Others are substantial, but at the same time relatively marginal in this regard.

 It is clear that there is a relationship between racial concentration and inferiority in achievement and low standards and consequently low morale. However, our mission is to determine inequality based upon race or ethnic origin, and we cannot undertake to cure all other ills which we might encounter here. The plaintiffs, of course, believe that all injustices ever encountered should be rooted out. Tentatively, at least, we have determined that for the present purpose a concentration of either Negro or Hispano students in the general area of 70 to 75 percent is a concentrated school likely to produce the kind of inferiority which we are here concerned with.

In the columnar list below, the elementary, junior and senior high schools with respect to which the plaintiffs have presented evidence are shown. It is to be

---

20. There is no discernible difference in result between the *de facto* and *de jure* varieties. Both produce the same obnoxious results, but the Supreme Court has so far given its attention to the more serious problem of dual schools.

21. Plaintiffs contend that where, as here, it is claimed that schools provide an unequal educational opportunity, it is irrelevant whether the schools in question are *de jure* or *de facto* segregated. This point is discussed later in this section.

22. These schools were selected by plaintiffs through use of probability theory. Thus, they claim that if all children were picked at random to attend each school in the District, the probability that the present racial composition would result at each of the above schools is phenomen-

ally low. We do note that the schools selected through this procedure are generally those with the highest concentration of minority students in the District.

23. Some of the above schools (Barrett, Smiley and East) have been considered, and full relief has been granted, in part I of this opinion. However, since these schools (with the exception of East) were clearly segregated before this suit was instituted, the statistical data on the educational opportunity provided by them prior to their desegregation has some relevance in creating an overall picture. as to the effect of segregation on educational opportunity, and hence it is included in the findings of fact which follow.

noted that some of these schools are subject to the findings and conclusions contained in part I of this opinion, but they are nevertheless included here because of their racial concentrations, if not in every instance their educational inferiority.

## ELEMENTARY SCHOOLS

| School | Anglo (%) | Negro (%) | Hispano (%) |
|---|---|---|---|
| * Barrett | 67.0 | 30.5 | 1.4 |
| Boulevard | 29.9 | .5 | 68.1 |
| Bryant-Webster | 23.3 | .5 | 75.5 |
| Columbine | .6 | 97.2 | 2.2 |
| Crofton | 7.3 | 38.4 | 51.5 |
| Ebert | 10.6 | 34.6 | 52.4 |
| Elmwood | 7.9 | 00.0 | 91.6 |
| Fairmont | 19.8 | 00.0 | 79.9 |
| Fairview | 7.0 | 8.2 | 83.2 |
| Garden Place | 17.0 | 17.2 | 64.7 |
| Gilpin | 3.2 | 36.4 | 59.4 |
| Greenlee | 17.0 | 9.0 | 73.0 |
| Hallett | 38.2 | 58.4 | 2.6 |
| Harrington | 2.2 | 76.3 | 19.6 |
| Mitchell | 2.2 | 70.9 | 26.7 |
| Smith | 4.0 | 91.7 | 3.3 |
| Stedman | 4.1 | 92.7 | 2.7 |
| Whittier | 1.4 | 94.0 | 4.5 |
| Wyatt | 1.9 | 46.4 | 51.5 |
| Wyman | 27.5 | 38.0 | 29.7 |

## JUNIOR HIGH SCHOOLS

| School | Anglo (%) | Negro (%) | Hispano (%) |
|---|---|---|---|
| Baker | 11.6 | 6.7 | 81.4 |
| Cole | 1.4 | 72.1 | 25.0 |
| Morey | 26.8 | 52.4 | 18.6 |
| * Smiley | 61.2 | 30.4 | 6.9 |

* Barrett and Smiley have been integrated by the preliminary injunction.

## SENIOR HIGH SCHOOLS

| School | Anglo (%) | Negro (%) | Hispano (%) |
|---|---|---|---|
| East | 50.1 | 39.9 | 7.4 |
| West | 56.6 | 9.0 | 34.0 |
| Manual | 8.2 | 60.2 | 27.5 |

Based on the rule of thumb adopted above, we are here primarily concerned with the following schools: Bryant-Webster, Columbine, Elmwood, Fairmont, Fairview, Greenlee, Hallett, Harrington, Mitchell, Smith, Stedman and Whittier Elementary Schools; Baker and Cole Junior High Schools; and Manual High School.

A. *Achievement*

Plaintiffs' evidence establishes that the scholastic achievement in the above schools is significantly lower than in the other schools in the city. To evidence this, they point to the 1968 Stanford Achievement Test results, which results are designed to measure the achievement level of each pupil in spe-

cific scholastic areas, such as spelling, arithmetic, and science. Achievement data for elementary, junior and senior high schools appears in Appendix I.

At the elementary school level, these Stanford Tests results are reported in terms of grade level scores for the third and fifth grades in May 1968. Since May 1 marks the approximate date at which the eighth month of school begins, we are told that a third grade student should be achieving at a 3.8 level at this time, while a fifth grade student should be achieving at a 5.8 level.

We find that in May 1968, the children in the third grade at the segregated schools in question achieved at a grade level of approximately 2.96, and accordingly, were almost one full year below the level at which they should have been achieving. With respect to all 91 schools in the District in 1968, the average median grade level was 3.57, or approximately six months above the achievement level of the schools listed above.

Similarly, the average achievement among fifth grade students at the 12 segregated elementary schools was 4.30. All fifth graders in the District averaged 5.22, which is almost a full year ahead of the 12 segregated schools.

The data with respect to junior high schools, also shown in Appendix I, is based upon the May 1968 Stanford Achievement Tests, and is reported in terms of percentile scores (no grade placement scores were available for junior or senior high schools). A percentile score shows the percentage of pupils nationally whose scores are below the given percentile. For example, if a student's percentile schore on a given test is 75, then 75 percent of the students in his grade nationally have scored lower on that test. Similarly, 25 percent of the students taking the test have scored higher.

The average percentile score for all ninth graders on all tests administered is 53.8. However, the two segregated junior high schools (Baker and Cole) achieved at an average percentile score of only 28.2. This is some 29 percentiles below the average percentile score among all ninth graders. It is interesting to note that the highest average percentile score of the two segregated junior high schools is lower than the lowest average percentile score at any of the other junior high schools in the city.

Senior high school data is based upon tests given in May 1968, to all eleventh grade students in the District, and, like the junior high school data, these scores are reported in terms of average median percentile.

The average median percentile score for all high schools at the eleventh grade level was 52. For Manual, the only minority concentrated high school, the average percentile score was 30. Thus, at the eleventh grade level Manual achievement was some 22 percentiles lower than the high school average for the city, and 70 percent of all students nationally performed better than the median at Manual.

B. *Teacher Experience*

Faculty experience is an important factor in determining the educational opportunity offered at a particular school, and plaintiffs have produced evidence which shows the percentage of faculty at a given school with (1) no years of prior Denver Public School experience; (2) probationary status (0–3 years of experience); and (3) 10 or more years experience. Teacher experience data for elementary, junior and senior high schools appears in Appendix II. At the elementary school level plaintiffs have compiled teacher experience data for their 20 target schools and 20 selected schools with high Anglo enrollment. We have here selected only those schools out of plaintiffs' list of target schools which we find to be segregated, and have compared teacher experience in them with teacher experience in plaintiffs' selected Anglo schools.

The evidence establishes that in the 12 segregated elementary schools in 1968, 23.9 percent of the teachers had no previous DPS experience, 48.6 percent were on probation and 17.4 percent had 10 or

more years experience. In contrast, in the 20 selected Anglo schools, only 9.8 percent of the faculty had no previous experience, 25.6 percent were on probation and 47.1 percent—nearly half—had 10 or more years of experience. Of the 12 segregated elementary schools, only one—Bryant-Webster—had a higher percentage of teachers with 10 or more years experience than teachers with no experience or on probation, while sixteen of the 20 Anglo schools had more teachers with 10 or more years experience than non-experienced or probationary teachers.

As to junior high schools, plaintiffs have introduced teacher experience data on all junior high schools in existence in 1968 (see Appendix II). This evidence establishes that the segregated schools have more probationary and non-experienced teachers and fewer teachers with 10 or more years experience than the selected Anglo schools.

The data with respect to senior high schools is similar to that on junior high schools. As was the case with the junior high schools, there are more high school teachers with no or little experience and fewer with over 10 years at Manual than in other senior high schools.

C. *Teacher Turnover*

The effect of teacher turnover on the quality of educational opportunity is twofold. First, a high teacher turnover rate tends to have a disorganizing effect on the school in question. Furthermore, and more important, the teacher turnover rate in a particular school significantly affects the experience of the faculty at that school. In the present case, plaintiffs have established that the present policy with respect to teacher transfers has the effect of creating a much higher turnover rate at predominantly minority schools than at predominantly Anglo schools. This in turn results in more faculty vacancies at these minority schools and the assignment to them of new teachers with little or no Denver Public School experience.

Denver Public Schools Policy 1617A deals with transfers for faculty. On or about April 20 of each year, the Assistant Superintendent for Personnel Services posts in each school a list of teaching vacancies to be filled the following school year. Those teachers who wish to transfer to schools with vacancies submit an application. Although the principal criterion for determining whether to grant an application for transfer is "whether the request will result in the best educational program for the School District," one of the major considerations for filling vacancies is seniority. Thus, teachers with the most seniority are normally given preference in making transfers. This transfer policy is embodied in an Agreement between School District Number One and the Denver Classroom Teachers Association.

This policy results in the more experienced teachers at minority schools transferring out of those schools when vacancies are opened at predominantly Anglo schools, with the resulting vacancies being filled by inexperienced teachers.

D. *Pupil Dropout Rates*

Plaintiffs' evidence as to dropout rates in junior and senior high schools [24] is set forth in terms of projected and annual dropout rates. The annual dropout rate merely indicates the percentage of students who leave school during a given year. The projected dropout rate for a given year reflects the percentage of students beginning at a particular school who will drop out before graduation (see Appendix III).

The evidence tends to indicate that, generally, the dropout rate is higher at the two segregated junior high schools (Baker and Cole) and Manual Senior High School than at the other schools in the District.

E. *Building Facilities*

Plaintiffs have introduced evidence in an attempt to show a disparity in the age of school buildings and the size of school sites between predominantly minority and predominantly Anglo schools. We would agree that, in most general terms,

24. Since, by law, it is mandatory that children attend school until the age of 16, there are no figures as to dropout rate with respect to elementary schools.

this disparity exists. However, we do not think that the age of a building and site size are, in and of themselves, substantial factors affecting the educational opportunity offered at a given school. However, we do recognize that in schools which are segregated, have less experienced teachers and produce generally low achieving students, the fact that the physical plant is old may aggravate the aura of inferiority which surrounds the school.

The above material summarizes plaintiffs' evidence and our findings as to the objective indicia of inequality at the schools for which they seek relief. Although plaintiffs claim that factors such as inexperienced faculty tend to contribute to the inferior educational opportunity provided at these schools, their main argument is that the segregation which exists at many of these schools makes a major contribution to this inferiority.

Dr. Dodson, a professor of education at New York University, who has for the past 15 years studied the relationship between the scholastic performance of minority children and segregated schools, testified that a segregated school adversely affects a Negro child's ability to achieve. He indicated that studies show that by the time a school becomes segregated, it is looked upon by the whole community as being inferior.

At this point, the Negro community does not consider the segregated school as a legitimate institution for social and economic advancement. Since the students do not feel that the school is an effective aid in achieving their goal—acceptance and integration into the mainstream of American life—they are not motivated to learn. Furthermore, since the parents of these Negro students have similar feelings with respect to the segregated school, they do not attempt to motivate their children to learn. Teachers assigned to these schools are generally dissatisfied and try to escape as soon as possible. Furthermore, teachers expect low achievement from students at segregated schools, and thus do little to stimulate higher performance.

The defendants do not acknowledge that segregated schools per se produce lower achievement and an inferior educational opportunity. They point to other factors, such as home and community environment, socioeconomic status of the family, and the educational background of the parents as the major causes of inferior achievement. We do not disagree that these factors are relevant, but we cannot ignore the overwhelming evidence to the effect that isolation or segregation per se is a substantial factor in producing unequal educational opportunity.

The first study of the equality of educational opportunity in the Denver Public Schools conducted by the Voorhees Committee recognized this. In its 1964 report to the Board of Education this Committee stated that

In a "neighborhood" school system one inevitable result of concentrations of races and ethnic groups because of housing patterns is concentrations of children in the schools into the same groups. There is abundant authority to the effect that "de facto" separation in schools may result in educational inequalities, and there is in Denver wide belief among the racial and ethnic minorities that the schools to which their children go are in some way unequal. In addition, however, there is the fact that there is not available to many children (perhaps a majority of the total school population, regardless of race or ethnic background) the democratic experience of education with members of other races and groups with which they will have to live and compete. The responsibility to eliminate or reduce this result where possible and to compensate for it where elimination is not possible by the removal of prejudice (whether based on color, ethnic or religious background, false values, or any other cause) must be the responsibility of the school to its pupils. Voorhees Committee Report, pp. 6–7.

The Committee also said:

In 1954 the United States Supreme Court stated that segregated education is inherently unequal education. There was then and is now ample authority for such a statement. While the Court in that instance was concerned with segregation established by law, the Committee is persuaded that the same statement can correctly be made where de facto segregation of minority races occurs because of other factors, the most obvious of which is a pattern of housing restriction. The Committee feels that in adhering without obvious deviation to the principle of establishing school boundaries without regard to racial or ethnic background, the Board and the administration have concurred, perhaps inadvertently, in the perpetuation of existing de facto segregation and its resultant inequalities in the educational opportunities offered. Voorhees Committee Report, pg. A–5.

As a result of the Voorhees Report, the School Board, on May 6, 1964, adopted Policy 5100 providing that henceforth the school administration would maintain statistical data on the racial and ethnic composition of students in the Denver Public Schools. In adopting the philosophy of the Voorhees Report the Board said:

The continuation of neighborhood schools has resulted in the concentration of some minority racial and ethnic groups in some schools. Reduction of such concentration and the establishment of heterogeneous or diverse groups in schools is desirable to achieve equality of educational opportunity.

In 1966 the School Board again created a committee to investigate inequality of educational opportunity due to racial concentration in schools (the Berge Committee). The Committee's report is replete with references to the inferior education which results from segregation.

When we consider the evidence in this case in light of the statements in Brown v. Board of Education that segregated schools are inherently unequal, we must conclude that segregation, regardless of its cause, is a major factor in producing inferior schools and unequal educational opportunity.

The equal protection clause of the Fourteenth Amendment prohibits any state from denying to any person the equal protection of the laws. Simply stated, a state may not treat persons differently without a legitimate reason for doing so. In the area of economic regulation the courts grant broad leeway to the states in creating classes of individuals and treating them differently. All that need be shown is a minimal justification in terms of a legitimate state interest for the inequality of treatment.

The courts, however, have jealously guarded the rights of disadvantaged groups such as the poor or minorities, and have held that where state action, even if non-discriminatory on its face, results in the unequal treatment of the poor or a minority group as a class, the action is unconstitutional unless the state provides a substantial justification in terms of legitimate state interest. See, e. g., Griffin v. Illinois, 351 U.S. 12, 18 n. 11, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).[25] This general principle of constitutional law is fully applicable to school segregation cases. The present state of the law

25. Under a claim for relief based upon separate-but-unequal school facilities, purpose or intent to discriminate is not a necessary factor. Where state action results in unequal treatment of the poor or minority groups, it is no defense that the state action was not taken with a purpose to injuriously affect only the poor or minorities as a class. See Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). See also Hobson v. Hansen, 269 F.Supp. 401, 497 (1967), which states:

The complaint that analytically no violation of equal protection vests unless the inequalities stem from a deliberately discriminatory plan is simply false. Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary

is that separate educational facilities (of the *de facto* variety) may be maintained, but a fundamental and absolute requisite is that these shall be equal. Once it is found that these separate facilities are unequal in the quality of education provided, there arises a substantial probability that a constitutional violation exists. This probability becomes almost conclusive where minority groups are relegated to the inferior schools. As Judge Wright stated in Hobson v. Hansen, *supra:*

> Theoretically, therefore, purely irrational inequalities even between two schools in a culturally homogeneous, uniformly white suburb would raise a real constitutional question. But in cases not involving Negroes or the poor, courts will hesitate to enforce the separate-but-equal rule rigorously. * * * But the law is too deeply committed to the real, not merely theoretical (and present, not deferred) equality of the Negro's educational experience to compromise its diligence * * * when cases raise the rights of the Negro poor. 269 F.Supp. at 497.

 As Judge Wright further pointed out in the *Hobson* case, *de facto* segregation today stands in the same position as did *de jure* segregation prior to Brown v. Board of Education. Under the old *Plessy* doctrine (Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)) a school board was under no constitutional duty to abandon dual school systems created by law so long as all schools were equal in terms of the educational opportunity offered. Today, a school board is not constitutionally re-quired to integrate schools which have become segregated because of the effect of racial housing patterns on the neighborhood school system. However, if the school board chooses not to take positive steps to alleviate *de facto* segregation, it must at a minimum insure that its schools offer an equal educational opportunity.

 The evidence in the case at bar establishes, and we do find and conclude, that an equal educational opportunity is not being provided at the subject segregated schools within the District.[26] (See page 78, *supra,* for a list of these schools.) The evidence establishes this beyond any doubt. Many factors contribute to the inferior status of these schools, but the predominant one appears to be the enforced isolation imposed in the name of neighborhood schools and housing patterns.[27] It strikes one as incongruous that the community of Denver would tolerate schools which are inferior in quality.

## IV.

## DISCUSSION OF REMEDIES

### A. *The Northeast Denver Schools*

Our preliminary injunction decree dealt largely with the Park Hill schools and, in effect, specifically enforced Resolutions 1520, 1524 and 1531, with the exception of that part of the resolution having to do with East Denver High School and that part having to do with Cole Junior High School.

In part I of this opinion we have determined that the plaintiffs are entitled to full relief in accordance with the Reso-

---

quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.

26. This, of course, does not mean that we condemn in any way the leadership and educational efforts of the administration and faculty of these schools. Principals and teachers alike have put forth an outstanding effort to cope with the educational problems in their schools. However, until the underlying causes of these problems are removed, the work of these individuals can never be fully successful.

27. We thus have a situation very similar to that found in Barksdale v. Springfield School Committee, 237 F.Supp. 543 (1965), vacated, 348 F.2d 261 (1st Cir. 1965). In that case Judge Sweeney found that *de facto* segregation was contributing to inequality of educational opportunity at the schools complained of. He then granted relief, not upon a theory that the School Board had an affirmative duty to remedy racial imbalance, but rather because the Constitution requires a School Board to provide equal educational opportunities for all children within the system.

lutions and are also entitled to have the East and Cole resolutions implemented in the final judgment. Inasmuch as we have concluded that the preliminary injunction should be made final, an appropriate form of judgment can be prepared to cover this. The preliminary order will remain in effect for the remainder of this year, and the present judgment will take effect in September 1970.

### B. *A Program of Improvement*

Although we have concluded that there is not *de jure* segregation in the so-called core city schools,[27a] we have found and concluded that there is a denial of equal opportunity for education in these schools. We have found and concluded that the achievement level in these schools is markedly lower and dropout rates are high; and that there has been a concentration of minority and inexperienced teachers.

How to remedy this condition, that is how to extend to the plaintiffs equal educational opportunity, poses a serious and difficult problem, and we do not here present any cure-all. One obvious answer, of course, is that these schools must be renovated as educational institutions. The stress here is not on the inferiority of the buildings, and, indeed, they are oftentimes older and less attractive. Rather, the emphasis is on improving these as educational institutions. One obvious equalizing factor would be to have faculty members who are as competent as the faculty members at Anglo schools.

At the present time, teachers with seniority can select the superior schools and they do so. When these transfers occur a degrading effect on the school which they leave necessarily results. All concerned are reminded that theirs is a less desirable school. It may be that the administration will have to adopt a rule which prohibits these optional transfers by faculty members. These schools are entitled to at least their fair share of the most competent teachers. The administration may have to assign their very best teachers even if premium salaries have to be paid in order to accomplish this.

It is also clear from the evidence that the remedial or special education programs which have been carried on in these schools have not resulted in any significant improvement and so other methods are indicated. It does not fill the bill to merely apply for a federal grant and reduce the teacher-pupil ratio.

Above all, these schools need pride and spirit so that the participants, teachers and pupils, will feel that they are part of a meaningful effort. Certainly a first step in instilling this is to provide them with leadership—dedicated personnel plus the tools to carry out programs. Whether this objective is possible cannot be determined until a genuine good faith effort is forthcoming. In Superintendent Gilberts and his staff the Board has access to experts who are capable of formulating such a program. Obviously this Court does not have this expertise, but it anticipates hearing from experts, including the Board staff.

### C. *Compulsory Transportation*

The evidence in this case shows that neither the plaintiffs nor the defendants nor other interested parties are in favor of bussing as such. It is, however, conceded to be a necessity where integration is ordered, and it would appear to be the only way to implement the Resolutions (1520, 1524 and 1531) and to carry out part I of this opinion.

In connection with equalizing the educational opportunity, it is not so clear that compulsory transportation is the answer. To be sure, if the children could go to school together on a natural basis, it would undoubtedly provide the most effective antidote for the inferiority. However, setting up an artificial and extensive system of bussing which compels cross-movement and which is not supported by either side has some tendency to undermine the program from the start.

There is a dearth of law in connection with the remedy applicable to equalizing the educational opportunity, and com-

27a. That is, the segregated schools referred to in part III above.

pulsory integration is not yet at least the prescribed remedy. However, it is conceivable that this could become the only effective remedy as a matter of law, and it conceivably could become recognized as a matter of constitutional law. Nevertheless, at this writing, the fashioning of a remedy is a process of weighing and balancing the equities.

From the intervenors and from other sources at the trial, the difficulties and vicissitudes of mandatory bussing have been presented. One persuasive point arises from the proof of the plaintiffs. Their evidence establishing the inferiority of the subject schools is so convincing that it raises a serious equitable question about subjecting any pupils, minority or majority, to them. It would be imposing a *sanction* on pupils from good schools—a sanction for an offense which they did not commit.

### D. *Voluntary Transfer Policy*

We have a single suggestion apart from improvement and that is a system of genuine voluntary transfer out of inferior schools to good schools. This would be a matter of right without the need for securing a reciprocal transfer from an Anglo school to a minority school. Persons desiring this immediate improvement of their educational opportunity could get it, and the District would, in accordance with its present policy based on distance, be required to furnish transportation. Moreover, the Board would be *required* to furnish space for these students. On the other hand, pupils attending the better schools would not be *compelled* to transfer to the core city schools.[28] They could do so if they wished.

Our suggestion recognizes that there are members of the minority groups who are not enthusiastic about compulsory bussing. These parents have the same apprehensions as the majority parents about sending their children into unknown conditions, and perhaps into hostile atmospheres. At the same time,

in many instances, they have the same hopes and aspirations for their children as do members of the majority and are willing to make the sacrifice in order to improve the educational opportunity for them.

Arguably, at least, this method satisfies the Constitution in that it recognizes the right of every student and makes that right available to him without forcing it on him. Comments of the litigants on this will be considered at a further hearing.

### E. *Voluntary Open Enrollment*

As to the voluntary open enrollment policy of the School Board, certainly they should be free to pursue and develop this to the nth degree. Their position at the trial was that this would ultimately produce integration. One questions whether it would, but if it can be operated successfully, the Board should be encouraged to carry it out. It should be noted, however, that this is neither "voluntary" nor is it "open" because it requires that there be spaces available in the transferee school or that there be an exchange program. It seems clear to us that there would be few participants in an exchange program with the core city schools. It seems highly unlikely that students would elect to go to these schools from white neighborhoods and so it is questionable whether any integration would be achieved in a substantial way from this program. On the other hand, the method selected above has no such "catch" in it.

It is contemplated that any decree which is finally promulgated here will not be effective until next fall. On the other hand, the preliminary injunction heretofore entered would continue for the remainder of this school year until next September when the final judgment would be effective. This opinion does not purport to be a judgment for the purpose of appeal. Final judgment will be entered after a meeting with counsel which hopefully can be carried out within the next 30 days.

28. This would not, of course, apply to students subject to part I of this opinion and the integration Resolutions because actual integration is a matter of constitutional law.

APPENDIX I: ACHIEVEMENT DATA

ELEMENTARY SCHOOLS

| Third Grade | | Fifth Grade | |
|---|---|---|---|
| School | Average Median Achievement | School | Average Median Achievement |
| Barrett | 2.81 | Barrett | 4.73 |
| Boulevard | 2.80 | Boulevard | 4.33 |
| Bryant-Webster | 3.16 | Bryant-Webster | 4.43 |
| Columbine | 2.93 | Columbine | 4.27 |
| Crofton | 3.10 | Crofton | 4.22 |
| Ebert | 2.71 | Ebert | 4.17 |
| Elmwood | 3.42 | Elmwood | 4.62 |
| Fairmont | 2.85 | Fairmont | 4.10 |
| Fairview | 2.96 | Fairview | 4.25 |
| Garden Place | 2.61 | Garden Place | 4.16 |
| Gilpin | 2.68 | Gilpin | 4.46 |
| Greenlee | 2.93 | Greenlee | 4.16 |
| Hallett | 3.06 | Hallett | 4.24 |
| Harrington | 2.55 | Harrington | 4.02 |
| Mitchell | 2.71 | Mitchell | 3.90 |
| Smith | 3.06 | Smith | 4.74 |
| Stedman | 3.13 | Stedman | 4.64 |
| Whittier | 2.76 | Whittier | 4.26 |
| Wyatt | 3.43 | Wyatt | 4.06 |
| Wyman | 3.05 | Wyman | 4.47 |

[A1602]

| JUNIOR HIGH SCHOOLS | | SENIOR HIGH SCHOOLS | |
|---|---|---|---|
| School | Average Median Percentile Score | School | Average Median Percentile Score |
| Baker | 31.1 | East | 54 |
| Byers | 63.0 | George Washington | 76 |
| Cole | 25.4 | John F. Kennedy | 73 |
| Gove | 63.2 | Abraham Lincoln | 59 |
| Grant | 55.7 | Manual | 30 |
| Hill | 77.4 | North | 53 |
| Horace Mann | 32.3 | South | 66 |
| John F. Kennedy | 71.4 | Thomas Jefferson | 72 |
| Kepner | 49.0 | West | 35 |
| Kunsmiller | 62.2 | | |
| Lake | 48.7 | | |
| Merrill | 74.1 | | |
| Morey | 30.3 | | |
| Rishel | 57.2 | | |
| Skinner | 55.2 | | |
| Smiley | 42.9 | | |
| Thomas Jefferson | 75.6 | | |

[A1603]

Cite as 313 F.Supp. 61 (1970)

APPENDIX II: TEACHER EXPERIENCE

ELEMENTARY SCHOOLS

(Plaintiffs' 20 Selected Target Schools)

| School | None | Probation | 10 or more years |
|---|---|---|---|
| Barrett | 21.1 | 31.6 | 21.1 |
| Boulevard | 16.7 | 50.0 | 27.8 |
| Bryant-Webster | 13.8 | 34.5 | 44.8 |
| Columbine | 27.3 | 50.0 | 11.4 |
| Crofton | 21.4 | 42.9 | 28.6 |
| Ebert | 21.1 | 42.1 | 26.3 |
| Elmwood | 39.1 | 39.1 | 17.4 |
| Fairmont | 25.0 | 78.6 | 10.7 |
| Fairview | 10.3 | 33.3 | 25.6 |
| Garden Place | 18.4 | 36.8 | 15.8 |
| Gilpin | 25.0 | 41.7 | 25.0 |
| Greenlee | 12.5 | 40.0 | 25.0 |
| Hallett | 25.0 | 46.4 | 28.6 |
| Harrington | 30.4 | 73.9 | 0.0 |
| Mitchell | 26.0 | 44.0 | 16.0 |
| Smith | 26.4 | 49.1 | 7.5 |
| Stedman | 23.7 | 39.5 | 13.2 |
| Whittier | 27.3 | 56.8 | 9.1 |
| Wyatt | 13.6 | 27.3 | 27.3 |
| Wyman | 22.2 | 50.0 | 16.7 |
| Total Average | 22.5 | 45.4 | 18.7 |

(Plaintiffs' 20 Selected Anglo Schools)

| School | None | Probation | 10 or more years |
|---|---|---|---|
| Ash Grove | 17.9 | 35.7 | 21.4 |
| Bradley | 2.9 | 11.8 | 58.8 |
| Bromwell | 18.2 | 18.2 | 45.5 |
| Carson | 16.0 | 40.0 | 48.0 |
| Cory | 0.0 | 18.2 | 40.9 |
| Doull | 14.7 | 20.6 | 58.8 |
| Ellis | 9.1 | 18.2 | 42.4 |
| Ellsworth | 25.0 | 62.5 | 25.0 |
| Fallis | 7.7 | 15.4 | 46.2 |
| Gust | 21.9 | 40.6 | 31.3 |
| Knight | 4.3 | 30.4 | 56.5 |
| McMeen | 3.0 | 24.2 | 51.5 |
| Montclair | 0.0 | 11.1 | 48.1 |
| Palmer | 6.3 | 12.5 | 75.0 |
| Pitts | 11.8 | 29.4 | 58.8 |
| Sabin | 8.0 | 20.0 | 38.0 |
| Slavens | 13.0 | 30.4 | 52.2 |
| Traylor | 10.3 | 20.7 | 58.6 |
| University Park | 14.3 | 37.1 | 48.6 |
| Washington Park | 0.0 | 36.8 | 36.8 |
| Total Average | 9.8 | 25.6 | 47.1 |

[A1604]

APPENDIX II: TEACHER EXPERIENCE (continued)

ALL JUNIOR HIGH SCHOOLS.

| School | None | Probation | 10 or more years |
|---|---|---|---|
| Baker | 32.1 | 60.7 | 10.7 |
| Byers | 14.0 | 43.9 | 26.3 |
| Cole | 39.6 | 65.9 | 14.3 |
| Gove | 31.0 | 45.2 | 19.0 |
| Grant | 19.5 | 34.1 | 24.4 |
| Hill | 14.5 | 33.7 | 36.1 |
| Kepner | 14.5 | 50.7 | 17.4 |
| Kunsmiller | 6.0 | 32.5 | 32.5 |
| Lake | 10.6 | 40.9 | 31.8 |
| Marn | 20.3 | 55.9 | 16.9 |
| Merrill | 16.2 | 35.1 | 33.8 |
| Morey | 27.8 | 53.7 | 13.0 |
| Rishel | 16.7 | 36.7 | 21.7 |
| Skinner | 15.0 | 38.3 | 23.3 |
| Smiley | 35.7 | 63.3 | 7.1 |
| Total Average | 21.1 | 46.7 | 22.0 |

Target Schools

| School | None | Probation | 10 or more years |
|---|---|---|---|
| Baker | 32.1 | 60.7 | 10.7 |
| Cole | 39.6 | 65.9 | 14.3 |
| Morey | 27.8 | 53.7 | 13.0 |
| Smiley | 35.7 | 63.3 | 7.1 |
| Total Average | 34.8 | 61.9 | 11.0 |

Anglo Schools

| School | None | Probation | 10 or more years |
|---|---|---|---|
| Hill | 14.5 | 33.7 | 36.1 |
| Merrill | 16.2 | 35.1 | 33.8 |
| Total Average | 15.3 | 34.4 | 35.0 |

ALL SENIOR HIGH SCHOOLS

| School | None | Probation | 10 or more years |
|---|---|---|---|
| Lincoln | 8.3 | 17.3 | 59.4 |
| East | 17.2 | 34.4 | 36.7 |
| George Washington | 8.9 | 17.0 | 54.1 |
| Kennedy | 6.6 | 15.4 | 48.5 |
| Manual | 17.1 | 37.8 | 32.4 |
| North | 8.2 | 29.1 | 41.8 |
| South | 8.2 | 16.4 | 55.7 |
| Thomas Jefferson | 6.8 | 22.2 | 50.6 |
| West | 14.5 | 30.0 | 40.0 |
| Total Average | 10.3 | 24.0 | 47.1 |

[A1609]

Cite as 313 F.Supp. 61 (1970)

APPENDIX II: TEACHER EXPERIENCE (continued)

### Target Schools

| School | None | Probation | 10 or more years |
|--------|------|-----------|------------------|
| East | 17.2 | 34.4 | 36.7 |
| Manual | 17.1 | 37.8 | 32.4 |
| West | 14.5 | 30.0 | 40.0 |
| Total Average | 16.3 | 34.1 | 36.4 |

### Anglo Schools

| School | None | Probation | 10 or more years |
|--------|------|-----------|------------------|
| George Washington | 8.9 | 17.0 | 54.1 |
| Kennedy | 6.6 | 15.4 | 48.5 |
| Thomas Jefferson | 6.8 | 22.2 | 50.6 |
| Total Average | 7.4 | 18.5 | 51.0 |

[A1606]

### APPENDIX III: PUPIL DROPOUT RATES

| Junior High Schools | Projected | Annual |
|---------------------|-----------|--------|
| Baker | 12.9 | 4.5 |
| Byers | 3.8 | 1.3 |
| Cole | 7.0 | 2.4 |
| Gove | 1.9 | .6 |
| Grant | 3.0 | 1.0 |
| Hill | .7 | .3 |
| Horace Mann | 6.7 | 2.6 |
| Kepner | 3.7 | 1.5 |
| Kunsmiller | 1.7 | .6 |
| Lake | 6.3 | 2.1 |
| Merrill | .8 | .3 |
| Morey | 15.7 | 5.1 |
| Rishel | 4.1 | 1.4 |
| Skinner | 2.1 | .8 |
| Smiley | 6.1 | 2.1 |
| John F. Kennedy | .3 | .2 |
| Thomas Jefferson | .6 | .2 |

| Senior High Schools | Projected | Annual |
|---------------------|-----------|--------|
| Abraham Lincoln | 38.1 | 14.7 |
| East | 46.8 | 18.8 |
| George Washington | 10.8 | 3.6 |
| Manual | 57.0 | 24.4 |
| North | 51.8 | 21.9 |
| South | 39.6 | 15.3 |
| West | 46.9 | 19.5 |
| John F. Kennedy | 13.0 | 1.9 |
| Thomas Jefferson | 9.9 | 1.7 |

[A1607]